Filed 12/4/25  In re A.R. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064210 |
| v. | (Super. Ct. No. 21DL0704) |
| A.R., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Antony C. Ufland, Judge. Reversed and remanded with directions.

Laura Vavakin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Michael J. Patty, Deputy Attorneys General, for Plaintiff and Respondent.

A.R. appeals from an order transferring him from the juvenile court to a court of criminal jurisdiction pursuant to Welfare and Institutions Code section 707 (all undesignated statutory references are to this code). He argues the evidence is insufficient to support the court's findings regarding the three statutory criteria in section 707, subdivision (a)(3)(A), (B), and (E), and the court therefore abused its discretion by ordering the transfer.

We reverse. We conclude the juvenile court abused its discretion by failing to consider mandatory factors in evaluating two statutory criteria: "[t]he degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)) and "[t]he circumstances and gravity of the offense alleged in the petition" (§ 707, subd. (a)(3)(E)(i)). We also conclude the evidence is insufficient to support the court's finding that A.R. could not "be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)), and the court therefore abused its discretion on this criterion. We remand the matter to the juvenile court to reconsider its decision.

FACTUAL AND PROCEDURAL BACKGROUND

I.

ALLEGED OFFENSE

At 7:16 p.m. on May 28, 2021, Officer Brandon Ramek of the Fullerton Police Department was dispatched to a home. When he arrived, he saw a vehicle that had crashed into a gate. A resident of the home reported seeing a person flee after the crash. While inspecting the vehicle, Ramek saw a person in the driver's seat, who had suffered a gunshot wound to his cheek and two to the side of his body, and determined the person was deceased. Ramek also found another person in the backseat, who said he had been shot twice and he had not met the shooter before. Ramek saw two bullet holes on

2

the driver's door. Next to the front passenger door, Ramek discovered a handgun on the ground.

Victoria Chandler, a homicide detective with the Fullerton Police Department at the time of the incident, was also dispatched to the crime scene. She found a cell phone under the decedent's body. After gaining access to one of the decedent's social media accounts, she uncovered several videos indicating the decedent was selling and consuming drugs. Chandler discovered a conversation between the decedent and A.R., between 5:00 p.m. and 5:30 p.m. on the day of the alleged offense, showing A.R. wanted to purchase drugs from the decedent and listing an address. During the investigation, she learned decedent was a confidential informant for the Orange County Sheriff's Department.

Chandler also gained access to one of A.R.'s social media accounts. In a message sent approximately eight minutes after the alleged offense, A.R. stated, "'Ay foo, I need a [hideout].'" A.R. also recorded videos, time-stamped on the date of the incident but before the shooting and filmed near the location of the alleged offense. In one video, A.R. focuses the camera on graffiti, and A.R. says, "'Nobody can cross me out.'" Chandler also watched dozens of videos of firearms and narcotics on A.R.'s account, featuring A.R. smoking marijuana, rifles lined up against a wall, and a handgun pointed at the camera. Chandler reviewed conversations indicating A.R. was asking other social media users "about prices of firearms" and "to show videos and ways to facilitate transactions." Chandler opined A.R. "was transactional in selling and purchasing" firearms.

Through video recordings, Chandler concluded the decedent parked his vehicle at an elementary school at 6:12 p.m. At 6:25 p.m., the decedent arrived at a motel and picked up the rear passenger. The rear

3

passenger brought a bag into the car. At 7:13 p.m., the vehicle returned to the elementary school and parked. Thereafter, video showed the vehicle approaching the residence, flashes of light inside the vehicle, and the vehicle then crashing. At the transfer hearing, Chandler testified the flashes of light were consistent with gunshots. Video depicted a person exiting the passenger side of the vehicle and running to an apartment complex. He then walked through the complex, removed his jacket, and jumped over a wall into another apartment complex.

The police interviewed the rear passenger at the hospital. The rear passenger said, when the decedent picked him up, A.R. was sitting in the front passenger seat. The rear passenger had not previously met A.R. and observed A.R. was wearing blue medical gloves. They went to a nearby elementary school to hang out, but after a few minutes, A.R. asked the decedent to drive A.R. home. As the decedent drove, A.R. showed the rear passenger a handgun and asked him to hold it. The rear passenger refused, as he did not want his fingerprints on the handgun. The rear passenger reported they were in the vehicle for approximately 20 minutes, conversed, and had no disagreement. At some point, A.R. turned, pointed the handgun at the rear passenger, and shot him. A.R. then shot the decedent at least twice. The rear passenger denied their meeting was a drug deal and did not know why A.R. shot him and the decedent. The rear passenger said "maybe a 'higher up' told [A.R.] the [decedent] should not be around anymore." The rear passenger stated he heard members of a local gang had turned against each other, and A.R. "appeared to be a young gang member." The rear passenger denied A.R. ever disclosed he was affiliated with a gang. The rear passenger was unaware the decedent was an informant.

4

Chandler acknowledged the rear passenger later said in a police interview the decedent was shot first. But she believed the rear passenger's initial statement to the police on the scene—that the rear passenger was shot first—could have been attributed to the intensity of the moment.

Law enforcement determined the handgun, which was recovered outside the vehicle, was the firearm used in the shooting. According to the crime lab report, the rear passenger's DNA was a "major contributor" to the DNA mixture on the trigger, and A.R.'s DNA was a "minor contributor." The decedent's, the rear passenger's, and a third person's DNA were "main contributor[s]" to the DNA mixture on the grip.

Chandler was aware the rear passenger had an arrest history of selling drugs. A search of the rear passenger's motel room uncovered a quantity of drugs exceeding personal use. Chandler believed the amount of drugs found in the vehicle indicated drug sales.

Chandler acknowledged some people informed the police the rear passenger "set up this entire situation." Chandler was also cognizant of rumors that a person stole a gun from the decedent or the rear passenger, and the rear passenger stole drugs from that person.

In October 2021, Chandler learned A.R. had overdosed, and she and a colleague went to the hospital to interview A.R., who made a statement after being advised of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436). A.R. initially denied he knew about a crash by his home. When Chandler told him she knew A.R. was responsible for a homicide, A.R. insisted he did not remember because he "used to take a lot of pills," specifically Xanax. Once the detectives showed him a video of the day of the alleged offense, A.R. admitted he was in the video but he could not recall what happened that day. He later denied he was in the video because he does

5

not "wear zipped up sweaters," but he acknowledged it could be him if he was under the influence of drugs that day. He then remembered sending a message and his address to the decedent. After the detectives played the entire video of the incident, A.R. recalled being in the vehicle, the vehicle crashing, and A.R. running home. He did not remember anything else. A.R. stated, "I feel I did [something wrong] and at the same time, [feel] I didn't." When asked if he thought he committed a crime, he said, "Yes. Somewhat." Chandler and her colleague arrested him for shooting the decedent and the rear passenger. A.R. was 17 years old at the time of the alleged offense, three or four months away from turning 18.

## II.

### JUVENILE WARDSHIP PETITION

In October 2021, the prosecution filed a juvenile wardship petition under Penal Code section 602, alleging A.R. committed murder with a firearm. (Pen. Code, §§ 187, subd. (a), 12022.5, subd. (a).) The petition also alleged A.R. "should be transferred to a court of criminal jurisdiction because [he] was [16] years of age or older when [he] committed[] murder."

## III.

### REPORTS

*A. Probation Report*

In September 2022, the juvenile court ordered the probation department to prepare a report under section 707, subdivision (a)(1). The report described the circumstances of the alleged offense. Detectives learned A.R.'s mother crossed the United States-Mexico border in August 2021, and they believed A.R. was in Mexico. It included a statement by A.R.'s mother and father, and it described A.R.'s personal history. He was the youngest of 10 children. A.R.'s mother said she and her husband had a "loving

6

relationship with" their children, including A.R. The parents stated the siblings had a "healthy relationship with one another." A.R.'s father reported he was seldom home because he had two jobs to support the family. His mother stated she spent significant time with A.R. at home, and he would discuss his daily activities with her. His mother reported he had not been exposed to domestic violence.

Although A.R.'s mother said the family did not have any contact with the Orange County Social Services Agency, his family was the subject of two informational reports to the agency. First, in 2019, A.R. was missing and ditching school. When confronted and interviewed, A.R. stated he ditched school because he smoked marijuana daily, "the 'people'" who lived with him provided the marijuana, and he planned to sell it. Second, in 2020, the police were called when A.R. and his brother were involved in a physical altercation. A.R. said he "might have 'killed'" his brother had they not separated.

Dr. Juliet Le Rankin, a clinical psychologist and A.R.'s clinical evaluation and guidance unit therapist, provided a statement on A.R.'s mental health in November 2022. Rankin said A.R. had been participating in individual therapy regularly since October 2021. She reported A.R. disclosed having "a long history of trauma within his own family as well as with [his] peer group, as well as a long history of exposure to substance abuse." She observed A.R. had "been making good progress and gained insight during this past year in treatment."

A juvenile correctional officer described A.R.'s behavior as satisfactory at juvenile hall. According to the officer, when A.R. arrived at juvenile hall, he "presented as immature for his age and did not appear to be taking his incarceration seriously." During 401 days of detention in juvenile

7

hall, A.R. "improved his behavior slightly but continues to have to be redirected on daily tasks." He "had two major incidents since" his arrival: a physical altercation in January 2022 and an overdose in April 2022.

The report recommended transferring A.R. to criminal court based on the five statutory criteria under former section 707. It found three criteria weighed in favor of transfer: the degree of criminal sophistication exhibited by A.R., whether A.R. could be rehabilitated before the juvenile court's jurisdiction ended, and the circumstances and gravity of the alleged offense. As for the two remaining criteria, A.R. had no previous delinquent history, and it was unknown whether A.R. had made any attempts at rehabilitation. The report noted A.R. was not interviewed for the report.

*B. Supplemental Probation Report*

In December 2022, the juvenile court ordered the probation department to prepare a section 707 supplemental report to include an interview with A.R. The probation department filed the supplemental report in February 2023. During the interview, A.R. was not asked about the alleged offense. A.R. specified many factors negatively impacting his childhood: "physical abuse from his older brothers, a chaotic home environment, not having parental figures, and substance abuse issues with himself as well as five of his siblings." He first smoked marijuana when he was five years old and, by the time he was eight, he smoked it daily. By the age of 16, he was using Xanax daily. He also admitted using alcohol, mushrooms, acid, and cocaine. His drug use "affected every facet of his life." When he was 15, he stopped attending school and worked for a construction company. A.R. denied he belonged to a gang, but he said he associated with gang members and had "been shot at[] 'more times' than he can count." A.R. believed those violent incidents traumatized him. He stated he was trying to improve himself,

8

engaging in unit programming, and participating in individual therapy weekly. Notwithstanding this social history, the probation department still recommended transfer to a criminal court.

*C. August 2023 Progress Report*

In August 2023, the probation department filed a progress report. The report stated A.R. was "doing well" in his unit at juvenile hall. He attended school and was eligible to graduate with 130 credits, due to an exemption by the State Department of Education, but he decided he wanted to complete the full 240 credits "and not 'cheat himself.'" A.R. participated in unit programming and completed programs covering "self-improvement, conflict resolution, healthy relationships, gang intervention, as well as career and leadership." A.R. also continued to meet with the clinical evaluation guidance unit.

IV.

TRANSFER HEARING

In October 2023, the prosecution moved to transfer A.R. to the criminal court under section 707, subdivision (a)(1). A.R. opposed the transfer.

The section 707 transfer hearing started in November 2023, and it spanned the course of several days during a six-month period. The prosecution called two witnesses: Ramek and Chandler. The defense called several witnesses: Robin Russell, "a correctional educator at juvenile hall"; two of A.R.'s sisters; one of his brothers; Alberto Lule of the Underground Scholars Credible Messengers Program at the University of California, Irvine (Underground Scholars); Ryan Rising of the Underground Scholars; Rankin; Suzanne Campbell, co-executive director of Underground Grit, a community organization; and Dr. Nancy Kaser-Boyd, a clinical and forensic psychologist

9

and a clinical professor of psychiatry and behavioral sciences at the Geffen School of Medicine. We summarize relevant testimony by defense witnesses *post*.

Russell testified as follows. She started teaching A.R. at juvenile hall when he was 18 years old. At the time of her testimony, A.R. was set to graduate "in the next couple of days" and receive a high school diploma after completing 220 credits.[1] In the last two and one-half years, A.R. had improved and matured. Russell thought A.R. was amenable to treatment in juvenile hall. When she first met A.R., he had very few life skills, but he had now "set some goals" and "made efforts to work through his challenges inside . . . and outside the classroom." His teachers nominated him to receive an award through Warming Hearts, a district-wide program designed to award students for their academic and behavioral achievements, and he won the last two years. For his most recent award, he wrote he wanted to use his award money to pay his family's rent. A.R. also won an honorable mention in an essay contest in the past year. If A.R. stayed at juvenile hall, he could pursue college programs.

One of A.R.'s sisters testified as follows. Her mother had children with three different fathers, and she and A.R. were their mother's ninth and tenth children, respectively. The family lived in four different homes during her upbringing. The family was "always getting kicked out because of" the sixth child, who always created trouble. At times, due to the family's financial situation, the family lived in a two-bedroom apartment with 12 to 16 people.

---

[1] We acknowledge the probation department stated A.R. completed 240 credits, whereas Russell said 220 credits. The difference has no impact here.

During their upbringing, their mother worked for one of their older brothers, raising his children. Their mother was absent from home most of the time, and their older sister raised them. Their mother did not seem to care for them. Her father was loving, but he was absent too due to work. The sixth sibling introduced marijuana to family members, and A.R.'s drug use increased before juvenile hall. Since being in juvenile hall, A.R. had matured, developed an understanding of the consequences of his actions, and wanted to change.

A.R.'s second oldest sister, the third child, testified A.R. matured since his arrest and became "a better person."

A.R.'s brother, the seventh child, testified he visited A.R. monthly in juvenile hall since A.R. was incarcerated. During that time period, he saw A.R. mature: "He speaks differently. He acts differently. He's a different kid."

Lule testified as follows. Lule belonged to Underground Scholars, a university-student organization. It seeks to form "credible messengers," individuals who have certain life experience enabling them to connect with and guide troubled youths. In February 2023, Lule began to meet with a group, including A.R., weekly. A.R. was an active participant in the program over the course of 13 months, was "a very, very good student," and looked forward to the future. A.R. was able to showcase his art at a conference, and he participated in a visual arts contest during which "he asked for a lot of feedback." A.R. also improved his attitude and skills. A.R. was capable of becoming a credible messenger if he were to stay in juvenile hall, given he had helped initiate certain activities.

Rising, who also belonged to Underground Scholars, testified as follows. A.R. had "mature[d] tremendously since" the day they met. Rising observed "multiple ways of [A.R.] showcasing this change through reading

11

the prompts after he writes to them and being open, asking the peers to . . . not talk while everyone is working together or someone is reading or somebody is writing." A.R. had become a leader, reminding his peers of the community agreements they established, helping set up the classroom, and passing out snacks. A.R. was working toward becoming a credible messenger, having received an initial certification, and Rising believed A.R. would be "an amazing credible messenger for our community in the future."

Rankin testified as follows. She had been a clinical psychologist for 16 years. She started working with A.R. "when he was initially detained" in October 2021. A.R. had been open in therapy. At the beginning, she had one-on-one therapy sessions with A.R. twice a week; later, they met once a week. A.R. also participated in group therapy. Rankin provided trauma-informed care, and she had uncovered "a lot of emotional abuse, verbal abuse, [and] physical abuse." A.R.'s older brother used drugs, and A.R. always feared "something bad would happen" when his brother was home. His brother "really fragmented" A.R.'s self-identity and self-esteem. A.R. "struggled with . . . sleep disturbance, nightmares, [and] flashbacks," and he was taking medication to treat these symptoms. He had also been "on and off" medication-assisted treatment "to target the cravings of certain substances." Rankin diagnosed him with posttraumatic stress disorder, adjustment disorder, anxiety, and depression. She opined his substance use allowed him to escape and disassociate from pain, A.R. made improvements on substance abuse, and he was suitable for psychosocial treatment. In two and one-half years, A.R.'s self-esteem had "improved significantly", and he "established a sense of self-identity and self-confidence."

Campbell testified Underground Grit provides reentry services to youths and adults "who have been in the system." She met with A.R. "weekly,

sometimes biweekly," after A.R. requested to work with Underground Grit. They discussed trauma, addiction, substance abuse, and treatment plans for A.R. to continue therapeutic one-on-one sessions in the juvenile setting and to move to an inpatient substance abuse treatment program with a mental health focus. A.R. was "very open" to treatment.

Kaser-Boyd testified as follows. The Orange County Public Defender's Office retained her to evaluate A.R. for the transfer hearing. She met with A.R. twice for several hours. She evaluated him under the section 707 criteria. She reviewed the police reports, a probation report, statements of probable cause, A.R.'s police interview, school records, the petition, search warrants, education certificates, and letters of support from family members. When she evaluates youth for their suitability for rehabilitation, she considers the youth's "motivation to change," "openness to treatment and participation in treatment," and "ability to form good attachments to other people" (i.e., a lack of callousness toward others). She also looks at "poverty, extraordinary stress, trauma, substance abuse." She learned about A.R.'s family history, including: his father working two jobs, his older brother carrying a knife and abusing methamphetamine, his fear of his older brother, his family's financial insecurity, his family's move to an apartment "that was in more of a gang neighborhood," and his exposure to drugs and use of drugs to forget pain. She recently learned A.R. disclosed to someone his history of sexual abuse, but she did not include it in her report. During a meeting, she administered a personality assessment inventory to determine whether A.R. had a diagnosable condition and whether he would be successful in treatment. She found A.R. was "elevated on depression," "elevated on traumatic stress," and "very, very elevated on drug abuse."

13

Kaser-Boyd found A.R.'s past acts—possessing drugs on school campus—were not criminally sophisticated. As for A.R.'s delinquent history and previous rehabilitation attempts, "[h]e had one detention, one apprehension by juvenile authorities and that was for having drugs on campus. And he was put into a drug treatment program," an intervention Kaser-Boyd believed was insufficient. Regarding whether A.R. could be rehabilitated before the juvenile court's jurisdiction concluded, she believed A.R., who was 20 and one-half years old at the time of her testimony, had made "very good changes since he was detained," namely attending school, graduating from high school, and demonstrating an interest in treatment. She opined that progress was predictive of further rehabilitation until he was 25 years old. She acknowledged the alleged offense was "very serious and grave." But, in consideration of the five criteria under section 707, subdivision (a)(3), Kaser-Boyd believed A.R. could be rehabilitated in the juvenile court system.

V.

JUVENILE COURT'S RULING

In May 2024, the juvenile court granted the motion to transfer A.R. to criminal court from juvenile court. After the court stated it considered the evidence and argument by counsel, it found by clear and convincing evidence A.R. should be transferred to criminal court. The court found the following criteria weighed in favor of transfer to criminal court: the degree of criminal sophistication (§ 707, subd. (a)(3)(A)), whether A.R. could be rehabilitated before the juvenile court's jurisdiction expired (§ 707, subd. (a)(3)(B)), and the circumstances and gravity of the alleged offense (§ 707, subd. (a)(3)(E)). However, the court found the prosecution failed to carry its burden of showing A.R. had a delinquent history (§ 707,

14

subd. (a)(3)(C)) and the outcome of prior rehabilitation attempts (§ 707, subd. (a)(3)(D)). The court concluded A.R. was "not [amenable] to rehabilitation while under the jurisdiction of the juvenile court."

As for the degree of criminal sophistication, the juvenile court found A.R. "was approximately 17 years and 8 months old at the time of the alleged offense." He appeared "to have been . . . average in maturity, intellectual capacity, and physical health at the time of the alleged offense. [¶] There was no evidence presented regarding impetuosity, failure to appreciate risks or consequences of criminal behavior. [¶] There was also no evidence presented to suggest any documented peer pressure or community environment on his actions. [¶] There was no evidence presented to suggest that involvement in the child welfare or foster care system or human trafficking were involved at all. [¶] Some evidence was presented that suggests that one of [A.R.]'s older siblings chronically created problems for the family's stability, and introduced [A.R.] to substance use at an early age. [¶] There was also a vague argument, that was not supported by any evidence, that [A.R.] may have been a victim of nonspecific sexual abuse. None of this evidence significantly mitigated the court's finding on this criterion. [¶] As far as sophistication surrounding the . . . alleged offense, there was some evidence that the victim of homicide was targeted, because he was [perceived to be] a law enforcement informant. [¶] There was also evidence to support a finding that both the decedent and [A.R.] were involved in the ongoing marketing and sales of controlled substances and/or firearms, and that the shooting may have been related to this."

Regarding rehabilitation before the juvenile court's jurisdiction expired, the court noted A.R. had been in custody for over two and one-half years since October 2021, was 20 years and 8 months old, and was eligible to

15

remain in the juvenile system for another four years and four months until he turned 25 years old. During his time in custody, A.R. received his high school diploma, participated in essay competitions, and met regularly with his therapist and Underground Scholars. A.R. was also studying for a financial literacy certification. In December 2023, he asked to work with Underground Grit. The court found A.R. had "an active substance[] abuse problem" because he overdosed shortly before his arrest in October 2021 and again "at some point" in custody at juvenile hall. "While evidence was presented to support an argument that [A.R. had] engaged in some prosocial activity and perhaps started to address his issues, the court cannot find that he [had] made any significant progress towards rehabilitation in the over two and [one-half] years that he's been in custody."

With respect to A.R.'s delinquent history and previous rehabilitation attempts, the juvenile court found none.

As to the circumstances and gravity of the alleged offense, the juvenile court found the evidence showed A.R. "personally shot and killed" the decedent when they were in a vehicle. "While the petition does not include charges regarding the [rear passenger,] [t]he evidence also indicated that during the same incident, [A.R.] personally shot and injured [the rear passenger] . . . in the vehicle." The court determined, "The level of harm actually caused by [A.R.], and his degree of involvement in the crime could not be greater. [¶] Testimony regarding [A.R.]'s troubled sibling and allegations of a lack of parental control involvement notwithstanding, there was nothing presented to suggest [A.R.]'s mental and emotional development is in any way explained or mitigates his actions."

A.R. timely appealed.

16

DISCUSSION

I.

LEGAL FRAMEWORK AND STANDARD OF REVIEW

Section 707 governs the procedure for transferring a youth from juvenile court to criminal court. It provides that, whenever a youth, 16 years or older, is alleged to have perpetrated a felony, the prosecution may move to transfer the youth "from juvenile court to a court of criminal jurisdiction." (§ 707, subd. (a)(1).) The prosecution has "the burden of proving that the minor should be transferred." (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).)

"The Legislature amended section 707 in 2023 and 2024. Effective January 1, 2023, Assembly Bill [No.] 2361 [(2021–2022 Reg. Sess.)] amended section 707[, subdivision] (a)(3) by adding the following italicized language: 'Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. *In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court*. In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E), inclusive. If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes*, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court*.'" (*Miguel R., supra*, 100 Cal.App.5th at p. 164.)

17

The juvenile court must consider five criteria in section 707, subdivision (a)(3)(A) to (E). They are: (1) "[t]he degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)); (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)); (3) "[t]he minor's previous delinquent history" (§ 707, subd. (a)(3)(C)(i)); (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" (§ 707, subd. (a)(3)(D)(i)); and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707, subd. (a)(3)(E)(i)).

Under each criterion, section 707 provides "a nonexhaustive list of relevant factors for the court to consider." (*Miguel R., supra*, 100 Cal.App.5th at p. 164.) "Effective January 1, 2024, Senate Bill [No.] 545 [(2023–2024 Reg. Sess.)] amended section 707 to require that with respect to each of those five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii)). The previous version of the statute made consideration of those factors discretionary, not mandatory." (*Miguel R.,* at pp. 164–165.)

"'[T]he court has the discretion to conclude that one or more of the five factors predominate so as to determine the result, even though some or all of the other factors might point to a different result.'" (*Miguel R., supra*, 100 Cal.App.5th at p. 168.) "[T]he statute says nothing about the relative weight to be given to any of the criteria." (*Id.* at p. 166.)

"We review the juvenile court's ruling on a transfer motion for abuse of discretion. [Citation.] 'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a

18

trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citation.] The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence. [Citation.] In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Miguel R., supra,* 100 Cal.App.5th at p. 165.)

The failure to "apply the law to the facts presented" constitutes "a failure to exercise the trial court's discretion." (*Fletcher v. Superior Court* (2002) 100 Cal.App.4th 386, 392.) "'[A] ruling otherwise within the trial court's power will nonetheless be set aside where it appears from the record that in issuing the ruling the court failed to exercise the discretion vested in it by law. [Citations.]' [Citation.] 'Failure to exercise a discretion conferred and compelled by law constitutes a denial of a fair hearing and a deprivation of fundamental procedural rights, and thus requires reversal.'" (*Ibid.*)

## II.

### THE JUVENILE COURT ABUSED ITS DISCRETION IN MAKING ITS FINDINGS UNDER SECTION 707'S CRITERIA

A.R. challenges the juvenile court's findings as to the three criteria that weighed in favor of transfer: the degree of criminal sophistication, rehabilitation before the juvenile court's jurisdiction ends, and the circumstances and gravity of the alleged offense. We conclude the court abused its discretion in making its findings concerning these three criteria.

*A. Degree of Criminal Sophistication*

When considering "[t]he degree of criminal sophistication exhibited by the minor" (§ 707, subd. (a)(3)(A)(i)), "the juvenile court shall

19

give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication" (§ 707, subd. (a)(3)(A)(ii)).

A.R. contends the juvenile court erred by determining A.R. exhibited criminal sophistication, because the court did not give appropriate consideration to A.R.'s childhood trauma and because the evidence supports a finding of "significant childhood trauma." The record indicates otherwise. The court stated it considered arguments of counsel, testimony of all witnesses, the reports, and the exhibits admitted into evidence. Its review "necessarily included evidence of" A.R.'s childhood trauma (*In re J.S.* (2024) 105 Cal.App.5th 205, 214), and the court recognized A.R's older sibling undermined the family's stability and introduced A.R. to drugs at a young age. On appeal, "we do not reweigh the evidence and we do not substitute our discretion for the discretion exercised by the trial court." (*Id.* at p. 211.)

A.R. next argues the juvenile court erred when it found no evidence was presented concerning "impetuosity or failure to appreciate risks and consequences of criminal behavior." (§ 707, subd. (a)(3)(A)(ii).) He also argues the court erred when it determined no evidence was presented regarding "the effect of . . . peer pressure on the minor's actions" or "the effect of . . . community environment" (*ibid.*).

Regarding impetuosity, certain evidence could suggest A.R. was impetuous. For example, in Kaser-Boyd's report, she found, through psychological testing, A.R. was "elevated on some scales that reflect hyperactivity" and he, as an adolescent drug user, "engag[ed] in antisocial behaviors in the pursuit of drugs." But A.R. does not cite anything in the record stating A.R. was impetuous. He cites only Kaser-Boyd's testimony that youth, generally, are likelier to be impulsive. Given the substantial evidence standard of review, we conclude it was reasonable for the juvenile court to find no evidence was presented on A.R.'s impetuosity.

With respect to peer pressure, A.R. invokes Kaser-Boyd's testimony that, when she prepares a report on a youth, she considers "peer pressure and peer involvement." But A.R. does not cite any express statements in the record that peer pressure affected A.R.'s actions. "In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings, not against them." (*Miguel R., supra*, 100 Cal.App.5th at p. 169.) It was therefore reasonable for the court to make this determination.

A.R. has a better argument concerning the juvenile court's community environment finding. The court stated, "There was . . . no evidence presented to suggest any documented . . . community environment on his actions." But there was evidence presented on this factor, specifically Kaser-Boyd's testimony and report. Kaser-Boyd testified A.R. and his family had moved to an apartment "that was in more of a gang neighborhood." Several people slept in the living room of his family's apartment due to the family's financial circumstances. According to Kaser-Boyd's report, A.R. disclosed he dressed as a gang member, albeit he "was not a formal member of a gang"; consequently, people perceived him as a gang member and "'would

21

try to jump [him], so [he] felt vulnerable.'" A.R. reported, "'[E]veryone on the street carries a gun, and that made me feel vulnerable.'" The court failed to consider this evidence.

A.R. also asserts the juvenile court found A.R. targeted the decedent for being a confidential informant without evidence indicating A.R. knew of the decedent's status. The Attorney General does not cite any evidence showing A.R. knew the decedent was a confidential informant, and we did not find such evidence in the record. Thus, the court's finding is speculative and not supported by substantial evidence.

In sum, substantial evidence supports some, but not all, of the juvenile court's findings. We recognize evidence in the record could support the court's finding that A.R. exhibited criminal sophistication (e.g., social media videos and conversations showed A.R. wanted to buy drugs from the decedent and harbored an interest in purchasing and selling firearms). But the court ignored or overlooked evidence regarding the community environment factor under section 707, subdivision (a)(3)(A)(ii). As a result of this error, the court failed to consider a mandatory factor in its evaluation of the criminal sophistication criterion. Its failure to do so constituted an abuse of discretion.

*B. Rehabilitation Before the Juvenile Court's Jurisdiction Ends*

When considering "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (§ 707, subd. (a)(3)(B)(i)), "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature" (§ 707, subd. (a)(3)(B)(ii)). "[T]he focus of the second criterion is whether there is enough time to rehabilitate the minor while the minor is still eligible to

remain under juvenile court jurisdiction." (*Miguel R., supra*, 100 Cal.App.5th at p. 166.)

Here, the evidence is insufficient to support the juvenile court's finding A.R. could not be rehabilitated before the juvenile court's jurisdiction expired. The court based its finding on A.R.'s "active substance abuse problem," as evidenced by his overdose in October 2021 before his arrest and another overdose in April 2022 while in custody. But the court did not cite any evidence showing why the substance abuse could not be addressed under the juvenile court's jurisdiction. Indeed, in her October 2023 report (and in her testimony), Kaser-Boyd opined A.R. could be rehabilitated by the expiration of the juvenile court's jurisdiction: "[T]he primary issues for [A.R.] are his substantial polysubstance abuse, which covered his underlying mental disorder symptoms of depression as well as anxiety from the daily life of his family. He has already begun to change during these two years in [j]uvenile [h]all. He has developed insight into the destructiveness of his polysubstance abuse, and he is thinking more clearly about the dysfunctional choices he made. It is my opinion that additional intervention in the [j]uvenile [j]ustice [s]ystem will result in his rehabilitation. This can be accomplished within the next five years." (Italics omitted.) "The prosecution offered no contrary expert testimony." (*Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 200 (*Kevin P.*).)

The Attorney General argues Kaser-Boyd acknowledged that generally people who experience more trauma and drug use need additional time to rehabilitate. Nonetheless, Kaser-Boyd still believed A.R. could be rehabilitated by the time the juvenile court's jurisdiction expired. The court did not indicate it found Kaser-Boyd's expert opinion lacked credibility or that it rejected Kaser-Boyd's opinion.

*C. Circumstances and Gravity of Alleged Offense*

When considering "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor" (§ 707, subd. (a)(3)(E)(i)), "the juvenile court shall give weight to any relevant factor, including, but not limited to, the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development" (§ 707, subd. (a)(3)(E)(ii)).

"The gravity criterion focuses on the offense "'alleged in the petition'" [citation], and like the other statutory criteria, it is 'based on the premise that the minor did, in fact, commit the offense.' [Citation.] But the allegation that a minor committed a serious offense, including murder, does not 'automatically require a finding of unfitness.'" (*Kevin P., supra*, 57 Cal.App.5th at p. 189.)

A.R. argues the juvenile court erred by finding A.R's "degree of involvement in the crime could not be greater" given he shot and killed the decedent. He asserts, "[T]he evidence suggests the act was impulsive," explaining the decedent was shot while driving the vehicle. A.R. also contends the rear passenger lacked credibility, because the rear passenger changed his account of whom A.R. shot first, claimed A.R. wore medical gloves yet the handgun had DNA of the three of them, and perceived A.R. to be a gang member when A.R. did not state any affiliation with a gang. These arguments are inviting us to reweigh the evidence, which we do not do on appeal. (*In re J.S., supra*, 105 Cal.App.5th at p. 211.) Substantial evidence supports the finding A.R's "degree of involvement in the crime could not be greater," as the evidence showed he shot and killed the decedent.

But, as A.R. asserts, the juvenile court erred by finding "[t]here was nothing presented to suggest [A.R.]'s mental and emotional development is in any way explained or mitigates his actions." Such evidence was presented. In her report, Kaser-Boyd opined: "It is important . . . to take into account the intoxication of [A.R.] at the time and the likely reality that he was not thinking clearly, and was impaired in judgment[.] Obviously, the law specifically seeks to avoid mitigation that involves voluntary drug intoxication. However, for a minor who has been addicted to drugs for quite some time, it seems important to understand that intoxication and long-term polysubstance use were important factors in the crime." She testified, while she did not have independent knowledge of what A.R. was thinking at the time of the crime, she drew an inference based on A.R.'s history that his thinking was unclear due to drug intoxication. She also testified A.R. used drugs to "help[] him forget the pain," both "physical pain from an auto accident and . . . emotional pain from his family life."

Although the juvenile court stated it considered all the evidence, it ignored or overlooked evidence presented by A.R. regarding his "mental and emotional development." (§ 707, subd. (a)(3)(E)(ii).) Due to this error, the court failed to consider a mandatory factor in its evaluation of the gravity criterion. It therefore abused its discretion in reviewing the factors under this criterion.

In sum, we find the juvenile court abused its discretion in evaluating the criminal sophistication criterion and the gravity criterion by failing to consider certain mandatory statutory factors. We also find substantial evidence does not support the court's finding that A.R. could not be rehabilitated before its jurisdiction expired.

The parties' briefs do not address what we should do when a juvenile court fails to consider a mandatory factor under one of the five statutory criteria. At oral argument, A.R. contended remand to the juvenile court for reconsideration would be appropriate under these circumstances. Section 707, subdivision (a)(3)(A) to (E) does not specify any mandatory factor is determinative in evaluating any one criterion, nor does it say any criterion should be accorded greater weight than the other. It is not the function of the appellate court to weigh the mandatory factors and determine whether a criterion militates in favor of transfer to a criminal court.[2] Therefore, "we are unable to say as a matter of law that '[n]o juvenile court could reasonably conclude, based on all of the evidence presented,' that he should be transferred to criminal court." (*Kevin P., supra*, 57 Cal.App.5th at p. 201.) We will reverse and remand the matter to the juvenile court for reconsideration of its decision. (See *ibid.* [remanding for reconsideration, where substantial evidence supported only two of the statutory criteria].)

---

[2] A.R. argues the evidence is insufficient to support the juvenile court's finding that he was not amenable to treatment pursuant to section 707, subdivision (a)(3). Under section 707, subdivision (a)(3), the court is required "to consider all five of the listed criteria in making the ultimate determination about the minor's amenability to rehabilitation while under the juvenile court's jurisdiction." (*Miguel R., supra*, 100 Cal.App.5th at p. 168.) On remand, in reconsidering the transfer motion, the court will make the amenability determination after evaluating the five statutory criteria.

Additionally, A.R. contends the juvenile court abused its discretion by relying on an outdated probation report. We need not address this argument. On remand, we will direct the court to order an updated probation report under section 707, subdivision (a)(1), because of the passage of time since the last probation report and hearing—not because we find the court abused its discretion.

## DISPOSITION

The juvenile court's order transferring the matter to a court of criminal jurisdiction is reversed. We remand to the juvenile court to reconsider the transfer motion. On remand, given the passage of time, the court shall order an updated probation report pursuant to section 707, subdivision (a)(1), that reflects current law and details any recent progress by A.R. It shall also permit the parties to present additional relevant evidence and arguments at the hearing.

MOTOIKE, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

GOODING, J.

27